IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| **RICHARD TABLER,** ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil Action No. _____** |
| ) | |
| **LORIE DAVIS,** ) | |
| **Director, Correctional Institutions** ) | |
| **Division, Texas Department of Criminal** ) | |
| **Justice, in her official capacity.** ) | |
| Defendant. ) | |

**COMPLAINT AND JURY DEMAND**

Plaintiff, by and through his attorneys, David A. Lane and Reid Allison of KILLMER, LANE & NEWMAN, LLP, and Richard Burr, BURR AND WELCH, PC, hereby brings this Complaint and alleges as follows:

**INTRODUCTION**

1. For nearly a decade, Richard Tabler has been housed in the Death Watch section of the Texas Department of Criminal Justice's ("TDCJ") death row, at the Polunsky Unit. He has spent 22 hours per day alone in a small cell. His family is prohibited from visiting him. Besides guards, the people he has interacted with in the Death Watch section have been executed within weeks of their being housed near Mr. Tabler.

2. This is an extreme and torturous existence for any person, which is why those for whom Texas has scheduled an execution spend only a limited, determinate amount of time in the Death Watch section—typically no more than 60-180 days. Studies on prolonged solitary confinement have indisputably shown that such housing significantly damages a person's

physical, mental, and emotional health, while risking heightened levels of anxiety, depression, and exacerbation of pre-existing mental health problems. In recent years, Supreme Court Justices have recognized that prolonged solitary confinement "exact[s] a terrible price," "literally drives men mad," and "raises serious constitutional questions." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring); *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting). Justice Sotomayor has recently quoted Charles Dickens' observations that "very few" are "capable of estimating the immense amount of torture and agony which this dreadful punishment [solitary confinement], prolonged for years, inflicts upon the sufferers." *Apodaca v. Raemisch*, 139 S. Ct. 5, 9-10 (2018) (Sotomayor, J., statement on denial of certiorari).

3. For Mr. Tabler, this is a personalized torture, profoundly exacerbating his longstanding severe mental health issues. This cruel, protracted housing has not only significantly worsened his mental health, it has also led him to attempt to take his own life multiple times.

4. Mr. Tabler's continued, indeterminate housing in the Death Watch section: (1) is Cruel and Unusual Punishment, in violation of the Eighth and Fourteenth Amendments; (2) unconstitutionally denies him Due Process, guaranteed by the Fourteenth Amendment, to prevent the atypical and significant hardships he suffers in the Death Watch section; and (3) violates his rights under the Americans with Disabilities Act ("ADA"). He must be immediately transferred out of the Death Watch section.

## JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*.

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction supporting

Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

7. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b). At all relevant times, Mr. Tabler has been incarcerated within the State of Texas, in the Eastern District, all housing decisions made by Defendant affected him there, and all of the parties were residents of the State of Texas at the time of the events giving rise to this litigation.

## PARTIES

8. Plaintiff Richard Tabler has been, at all relevant times, a state prisoner in custody of the TDCJ and housed in the Death Watch section of death row in the Polunsky Unit, Livingston, Texas.

9. Defendant Lorie Davis is the Director of the Correctional Institutions Division ("CID") of TDCJ. As Director of the CID, Defendant Davis is responsible for housing decisions, planning, direction, and coordination of all programs and operations of Texas state prisons, including death row and the Death Watch section at the Allan B. Polunsky Unit ("the Polunsky Unit"), located at 3872 FM 350 South, Livingston, Texas, 77351. Defendant Davis interpreted laws, policies, and operational procedures relevant to all employees at the Polunsky Unit and death row. As part of her directorship of the CID, Defendant Davis authorized and/or condoned the unconstitutional housing of Mr. Tabler. As such, she directly and proximately caused the constitutional and statutory violations set forth below. At all relevant times, Defendant Davis was acting under color of state law, as an official representative of the TDCJ.

## FACTUAL ALLEGATIONS

**I. Mr. Tabler's Cruel and Unusual housing**

10. Mr. Tabler has been housed in the Death Watch section of TDCJ's death row at the Polunsky Unit since January 2, 2011.

11. The Death Watch section houses those TDCJ inmates who have an imminent

3

execution date, scheduled within 60-180 days. Therefore, inmates spend only a limited, pre-determined amount of time in the Death Watch section.

12. Mr. Tabler does not have an execution date and has not had one scheduled at any point during his nearly ten years housed in the Death Watch section.

13. Mr. Tabler is in the Death Watch unit as punishment for his having been caught with a cell phone approximately ten years ago.

14. The restrictions within the Death Watch section are extreme.

15. Mr. Tabler is held in solitary confinement conditions for 22 hours every day, in a miniscule, 60-square-foot cell.

16. He is provided meals through a slot in the door of his cell.

17. He spends his limited recreation time in a pen separate from other inmates.

18. Mr. Tabler is allowed virtually no face-to-face contact with other inmates.

19. The harshness of these death row conditions, designed intentionally to limit human contact, is substantially exacerbated by Mr. Tabler's unusual status among death row inmates—though he is not scheduled for execution, he is housed exclusively among inmates who are within months of their own scheduled executions.

20. Death row inmates can communicate to a limited extent with other inmates. Given their years- and decades-long waits for execution, these limited communications allow inmates to form relationships and friendships, providing at least some human contact.

21. Perversely, aside from impersonal communications with prison guards, the only people with whom Mr. Tabler is permitted to communicate are sent to be executed within weeks of meeting him. Rather than the comfort that other inmates are permitted to draw from their limited society with one another, Mr. Tabler is confronted with an endless procession of men who are put to death as soon as he is able to form an attachment to them.

22. Indeed, while Mr. Tabler has been housed in the Death Watch section, TDCJ has executed over 90 inmates. Mr. Tabler had formed friendships with at least a dozen of those who were then executed. On average, once a month an inmate has been executed, after spending his final weeks housed in the Death Watch section with Mr. Tabler.

23. Though this bizarre and torturous circumstance would no doubt take a severe toll on the mental well-being of any inmate, Mr. Tabler's specific mental health problems are such that he suffers an unusually elevated level of stress and mental anguish from the loss of people to whom he has become attached.

24. The conditions for Mr. Tabler in the Death Watch section are so severe and have such a profound impact on his mental health that in 2011, a federal judge denied his request to drop his habeas appeals and be executed, after finding that his conditions of confinement coerced him to that decision.

25. Despite the judge's explicit finding that Mr. Tabler's conditions of confinement were so onerous as to coerce him into an effective suicide by dropping his habeas appeals, Mr. Tabler remains housed in the Death Watch section.

26. Mr. Tabler has never been afforded a meaningful process in which to challenge his housing in the Death Watch section and argue for a transfer to Texas' less restrictive standard death row, where he might at least find relief from his constant loss of friends to the death chamber under his current conditions.

**II.    Mr. Tabler's severe mental health issues**

27. Throughout Mr. Tabler's incarceration, TDCJ has known of his substantial mental health issues.

28. Mr. Tabler has long been diagnosed with Fetal Alcohol Spectrum Disorder (specifically, Alcohol-Related Neurodevelopmental Disorder) and Klinefelter Syndrome. These diagnoses reveal that Mr. Tabler suffers multiple central nervous system dysfunctions, resulting in decreased impulse control, heightened anxiety, mood lability, low frustration tolerance, depression, and executive function impairment. TCDJ has been aware of these diagnoses for nearly five years.

29. With respect to his Fetal Alcohol-Related Neurodevelopmental Disorder, Mr. Tabler suffers difficulty with social skills, including lack of stranger fear, naivete and gullibility; inappropriate choice of friends; immaturity; difficulty understanding the perspective of others; and poor social cognition.

30. Mr. Tabler also meets the criteria for Bipolar Disorder and Attention Deficit Hyperactivity Disorder.

31. In addition to these significant mental health issues, he has suffered repeated traumatic brain injuries.

32. This particular combination of mental health disorders, resulting in emotional instability for Mr. Tabler at the best of times, leaves him without the emotional and cognitive ability to effectively process the loss of people close to him. In the Death Watch section, such losses are frequent and unavoidable and subject Mr. Tabler to undue suffering well beyond what a neurotypical inmate might experience.

33. Mr. Tabler has repeatedly expressed mental distress, including suicidal ideation, and has displayed physically self-harming and suicidal behaviors since his placement in the Death Watch section, often in connection with the frequent loss of friends as a result of their execution. What follows are a few examples of his significant mental health deterioration between 2011 and 2015 due to his housing in the Death Watch section.

34. On February 22, 2011, security and medical personnel contacted Mr. Tabler after he intentionally cut his right arm open.

35. In addition to his overt attempt to kill himself, Mr. Tabler made multiple suicidal statements during that contact with jail personnel.

36. A nurse who spoke with Mr. Tabler noted that she believed Mr. Tabler's suicidal statements might be genuine, and that he should be evaluated by a mental health professional.

37. Mr. Tabler asked the nurse for help with his suicidal impulses and was placed in a psych observation cell.

38. While housed in the observation cell, Mr. Tabler spoke with mental health staff. Mr. Tabler stated that a friend of his from death row had been executed a week earlier, and that another friend was being transported to Huntsville to be executed. Mr. Tabler discussed how difficult he found it to deal with the losses.

39. Asked whether he felt that other inmates' lives were more important than his own life, Mr. Tabler responded affirmatively. The mental health staff who interviewed Mr. Tabler noted that he was surprised by the question and that his eyes filled with tears as he answered.

40. Mr. Tabler recounted a conversation with another death row inmate during which Mr. Tabler voiced a desire to trade places with that inmate so that he could be executed.

41. On November 29, 2012, mental health staff noted that Mr. Tabler vented concerns about recent executions.

42. On February 20, 2013, mental health staff assessed Mr. Tabler after he made suicidal statements in a letter directed to his family and attorney, including a statement that he intended to complete suicide on March 11.

43. During the February 20, 2013 mental health assessment, Mr. Tabler indicated that one of the reasons he wanted to kill himself was that a friend of his was going to be executed the

following day.

44. On October 4, 2013, Mr. Tabler was assessed for urgent mental health needs after he threatened to cut himself with razor blades. Mr. Tabler informed mental health staff that he no longer felt that he was in control and asked to be transferred to the Jester IV inpatient psychiatric facility. The transfer was ordered the same day for the purposes of crisis management.

45. On October 8, 2013, during Mr. Tabler's stay at the Jester IV facility, Mr. Tabler informed staff that he remained very upset and needed to get some things off his chest. He stated that five out of six recently executed inmates had been friends of his, and that their loss had affected him deeply.

46. On October 9, 2013, still at the Jester IV facility, Mr. Tabler reported increased depressive symptoms, including irritability, disturbance of his sleep pattern, decreased appetite, and thoughts of hopelessness. During the same interaction, Mr. Tabler noted his concerns about his housing in the Death Watch section, the pod where death row inmates with imminent execution dates are housed. Mr. Tabler stated that he becomes close with the offenders housed near him, only to lose them to execution, and again referenced his friendship with five of the past six inmates executed. Mr. Tabler explicitly connected the loss of these five inmates with an increased sense of hopelessness and feelings of depression during this conversation.

47. On October 10, 2013, still at the Jester IV facility, Mr. Tabler again indicated his plans for self-harm to mental health staff, and he again explicitly connected his feelings of depression to the fact that several of his friends had been executed over the previous six months.

48. On October 14, 2013, still at the Jester IV facility, Mr. Tabler once more indicated that his poor mental health was connected to the loss of his fellow death row inmates, noting that he had seen 27 men executed.

49. On October 15, 2013, still at the Jester IV facility, mental health staff asked Mr.

Tabler to verbalize his principal problem that would be the focus of his clinical attention. Mr. Tabler asked staff to let him stay at Jester IV for a while rather than returning to the Death Watch area of death row, stating that he needed a break from Death Watch. He again expressed distress related to five of the past six men executed having been his friends. He told mental health staff that he would attempt to harm himself if and when he was returned to Death Watch.

50. Mr. Tabler also told mental health staff that he had been experiencing auditory hallucinations, hearing his friends who had been executed. He stated that he had most recently heard the auditory hallucinations the day after another offender had been executed.

51. On October 17, 2013, Mr. Tabler reported that his problems originated from his housing in the Death Watch section, and that he had seen 40 inmates executed over the course of his incarceration. He further reported that he had experienced auditory hallucinations in conjunction with his friends being taken to be executed, and stated that he felt upset that he would continue to live while his friends were executed. The mental health staff noted that Mr. Tabler's concerns appeared reflective of survivor's guilt.

52. On April 1, 2014, having returned to the Death Watch section, Mr. Tabler was seen by mental health staff after the facility's mail room again reported that Mr. Tabler had made suicidal statements in outgoing mail. Mr. Tabler once again told mental health staff that he was upset by being forced to witness other offenders being taken to die, an inevitable result of his housing in the Death Watch section. He indicated that he had been giving away his property as a precursor to an approaching suicide attempt.

53. On April 2014, Mr. Tabler expressed a desire to stop consuming food and liquids, noting that he was tired from watching executions. Mental health staff noted that Mr. Tabler appeared to desire to go into renal failure and seemed depressed.

54. On February 12, 2015, Mr. Tabler reported that he was feeling down about a

recent execution.

55. On numerous other occasions, and until the present day, Mr. Tabler's mental health has been substantially worsened by his housing in the Death Watch section, and he has continued to exhibit suicidal behaviors throughout his time in the Death Watch section.

56. Indeed, he attempted suicide and very nearly succeeded in June 2019. Mr. Tabler sliced his arm open from wrist to shoulder and nearly died. This was just the most recent in Mr. Tabler's established history of suicide attempts to escape his present torturous day-to-day experience in the Death Watch section.

57. As referenced above, the conditions remain so severe that a federal district judge has previously refused to allow Mr. Tabler to drop his habeas appeals, finding that his conditions of confinement were coercing him to seek execution rather than continue living in the Death Watch section.

58. Plaintiff has fully, properly, and timely exhausted all available administrative remedies in connection with the events described herein.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violations of the Eighth and Fourteenth Amendments
### Cruel and Unusual Punishment

59. At all times relevant to this action, the Defendant was responsible for promulgating and implementing policies, practices, and procedures relating to inmate classifications and housing decisions.

60. The Defendant's decision to house Mr. Tabler in prolonged solitary confinement, among men due to be executed in mere weeks, in the Death Watch section has deprived and continues to deprive him of basic human needs. Mr. Tabler's continued, indeterminate housing in the Death Watch section is cruel and unusual punishment because this housing deprives him of

basic human needs, imposes serious and irreparable psychological and physical injury on his person, and violates present-day standards of human dignity.

61. The indefinite duration of Mr. Tabler's housing in the Death Watch section poses significant risks of incapacitating him and causing him permanent mental and psychological injury.

62. The Defendant's housing Mr. Tabler in the Death Watch section inflicts disproportionate punishment on him.

63. Housing him in these cruel conditions serves no valid, legal purpose and lacks penological justification.

64. The Defendant's infliction of mental and physical harm on Mr. Tabler strips him of his dignity and worth, transgresses civilized society's notions of decency, and is a practice that is disavowed in contemporary society.

65. The mental and psychological anguish inflicted on Mr. Tabler as a result of his housing in the Death Watch section are obvious to Defendant and any other reasonable person. Defendant knows that Mr. Tabler is suffering substantial and ongoing injury.

66. As a direct and proximate result of Defendant's constitutional violations, Mr. Tabler will continue to be irreparably injured. He will suffer irreparable harm unless Defendant is enjoined from continuing this unconstitutional housing decision.

## SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Violation**

67. Plaintiff Tabler incorporates all other paragraphs of this Complaint for purposes of this Claim.

68. Defendant has substantially increased the punishment suffered by Mr. Tabler by placing him permanently in the Death Watch unit.

69. Defendant has sporadically conducted hearings for inmates facing unusual increased levels of security within the prison system. The Defendant has created a liberty interest through the implementation of hearings, which give inmates the chance for less restrictive confinement and by maintaining a standard death row at the Polunsky Unit, as well as the Death Watch section in which Plaintiff Tabler has been housed for nearly a decade.

70. Plaintiff Tabler has this liberty interest in a due process hearing which may result in a less restrictive and torturous confinement and therefore must be afforded sufficient due process before the interest can be refused.

71. Plaintiff Tabler has not been provided sufficient process to argue for transfer to the less restrictive standard death row and exercise this liberty interest, in violation of his Fourteenth Amendment right to Due Process.

72. By denying him meaningful review of his protracted, indefinite housing in solitary confinement in the Death Watch section and never affording him the opportunity to be considered for transfer to the less restrictive death row, Defendant is denying Mr. Tabler liberty without due process of law.

73. Indefinite confinement in the isolated Death Watch section, with no prospect of meaningful review for transfer to the less restrictive death row unit, imposes atypical and significant hardship on him in relation to the ordinary incidents of prison life.

74. Every other prisoner in Mr. Tabler's Death Watch section has been promptly executed, and no other prisoner has ever been subjected to housing in this unit indefinitely.

75. Defendant's acts and omissions are the proximate cause of the violation of Plaintiff Tabler's rights under the Fifth and Fourteenth Amendments.

76. The acts or omissions of Defendant were conducted within the scope of his official duties and employment.

77. As a direct and proximate result of Defendant's acts or omissions, Plaintiff Tabler has suffered harm and is at risk of suffering harm going forward, until he is provided sufficient process to consider him for transfer to the less restrictive and torturous standard death row unit.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 12132, *et seq.* – Violation of Title II of the Americans with Disabilities Act of 1990, as Amended
### Unlawful Discrimination and Failure to Reasonably Accommodate

78. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

79. The Americans with Disabilities Act (hereinafter referred to as the "ADA"), 42 U.S.C. §§ 12101 *et seq.*, and specifically 42 U.S.C. §§ 12131-12134, prohibits discrimination in public services on the basis of disability. 42 U.S.C. § 12132 provides:

> Subject the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

80. The ADA defines a "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or local government, 42 U.S.C. § 12131(1). The Texas Department of Criminal Justice is a "public entity" within the meaning of the ADA.

81. Mr. Tabler is a person that Defendant knew had a disability, including severe mental health issues and suicidal ideation, that substantially limits his major life activities.

82. Plaintiff, with or without reasonable modifications to rules, policies or practices, met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the Defendant. Thus, Plaintiff was a "qualified individual with disabilities" within the meaning of the ADA, 42 U.S.C. § 12131(2).

83. Plaintiff was qualified to participate in the services, programs, activities, and benefits provided to inmates in the TDCJ's custody within the meaning of Title II of the ADA.

84. Defendant was on notice regarding Mr. Tabler's serious mental health issues, suicidal state of mind, and repeated suicide attempts.

85. Defendant failed to reasonably accommodate Mr. Tabler's disabilities despite knowing of his suicidal ideation, and related impairments and conditions.

86. An obviously reasonable accommodation exists, that TDCJ has failed to provide Mr. Tabler: moving him out of the Death Watch section and back to death row.

87. Defendant's actions and inactions violated clearly established law under Title II of the ADA and its implementing regulations.

88. Defendant had no legitimate basis for violating Mr. Tabler's ADA rights.

89. Defendant's actions and inactions are objectively unreasonable in light of the circumstances.

90. Defendant's actions and inactions are the proximate and legal cause of Plaintiff's injuries.

91. Plaintiff has been and continues to be damaged by Defendant's unlawful conduct under the ADA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and grant:

(a) Appropriate relief at law and equity;

(b) Declaratory and injunctive relief, as well as other appropriate equitable relief;

(c) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(d) Any further relief that this Court deems just and proper, and any other relief as allowed by law.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated this 16th day of March 2020.

KILLMER, LANE & NEWMAN, LLP

s/ David A. Lane
David A. Lane
Reid Allison
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
rallison@kln-law.com


BURR AND WELCH, PC

s/ Richard Burr
Richard Burr
Texas Bar No. 24001005
Burr and Welch, PC
PO Box 525
Leggett, Texas 77350
(713) 628-3391
(713) 893-2500 fax
dick.burrandwelch@gmail.com


ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing pleading was served electronically upon Kristen Worman (kristen.worman@tdcj.texas.gov), General Counsel for the Texas Department of Criminal Justice and counsel for Respondent, this 16th day of March, 2020.

                              /s/Richard H. Burr
                              Counsel for Plaintiff