## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| **RICHARD TABLER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 9:20-cv-00049** |
| | ) | |
| **LORIE DAVIS, DIRECTOR OF** | ) | |
| **CORRECTIONAL INSTITUTIONS DIVISION,** | ) | |
| **TEXAS DEPARTMENT OF CRIMINAL** | ) | |
| **JUSTICE,** | ) | |
| **in her official capacity;** | ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT LORIE DAVIS'S MOTION TO DISMISS
## [ECF No. 9]

---

Plaintiff, by and through his attorneys, David A. Lane and Reid Allison of KILLMER, LANE & NEWMAN, LLP, and Richard Burr, BURR AND WELCH, PC, hereby submits the following Response to Defendant's Motion to Dismiss [ECF No. 9] ("*Def's Mot.*").

### I.  INTRODUCTION

Plaintiff Richard Tabler filed this lawsuit to achieve a very simple goal: to be moved from the nearly uniquely torturous housing he has been subjected to for almost a decade. He is not asking to be moved out of death row, altogether; he is not asking to be released. Reading Defendant's pending motion to dismiss could easily give the wrong impression of the very limited injunctive relief Mr. Tabler seeks. Viewed properly, Mr. Tabler has plausibly alleged violations of his federal constitutional and statutory rights that must be allowed to proceed to discovery.

## II. FACTS ALLEGED

Mr. Tabler has been housed in the Death Watch section of the Texas Department of Criminal Justice's ("TDCJ") death row since January 2, 2011. *See Complaint* [ECF No. 1], at ¶ 10. The restrictions within this unit are extreme and include 22-hour per day solitary confinement in a tiny 60-square foot cell. *Id.* at ¶¶ 14-15. Mr. Tabler's meals are provided through a slot in the door, and he is allowed virtually no face-to-face contact with other prisoners. *Id.* at ¶¶ 16-18. The Death Watch section is reserved for prisoners who have an imminent execution date, scheduled within 60-180 days. *Id.* at ¶ 11. Therefore, every other prisoner that Mr. Tabler has had contact with in the last ten years has been killed by the state within mere months. *Id.* Mr. Tabler does not have an execution date and has not had one scheduled at any point during his decade in Death Watch. *Id.* at ¶ 12.

These conditions are designed to limit human interaction and do so to a severe degree. *Id.* at ¶ 19. However, there is a special cruelty in Defendant's treatment of Mr. Tabler, as the limited interaction he has is with prisoners who are at their last extremity and are only months away from being killed. *Id.* at ¶ 21. "Rather than the comfort that other inmates are permitted to draw from their limited society with one another, Mr. Tabler is confronted with an endless procession of men who are put to death as soon as he is able to form an attachment to them." *Id.* at ¶ 21. While Mr. Tabler has been housed in Death Watch, TDCJ has killed over 90 prisoners. *Id.* at ¶ 22. Mr. Tabler was able to form brief friendships with at least a dozen of these doomed men. *Id.*

These conditions are severe and would take a toll on the mental health of any prisoner. *Id.* at ¶ 23. But the conditions are particularly cruel to Mr. Tabler, because of his underlying mental disabilities, which are both obvious and well known to TDCJ and Defendant. *Id.* at ¶¶ 23, 27. Mr. Tabler suffers "an unusually elevated level of stress and mental anguish from the loss of people to whom he has become attached." *Id.* He has been diagnosed with both Fetal Alcohol

2

Spectrum Disorder and Klinefelter syndrome. *Id.* at ¶ 28. These mental disabilities cause Mr. Tabler "decreased impulse control, heightened anxiety, mood lability, low frustration tolerance, depression, and executive function impairment." *Id.* Mr. Tabler's mental disabilities also cause him "difficulty with social skills, including lack of stranger fear; naivete and gullibility; inappropriate choice of friends; immaturity; difficulty understanding the perspective of others; and poor social cognition." *Id.* at ¶ 29. Mr. Tabler also meets the criteria for Bipolar Disorder and Attention Deficit Hyperactivity Disorder, and he has suffered repeated traumatic brain injuries. *Id.* at ¶¶ 30-31.

Mr. Tabler's idiosyncratic combination of mental health disabilities leaves him completely unable to process the loss of people close to him. *Id.* at ¶ 32. The toll this housing has taken on him is so severe that he has experienced auditory hallucinations, hearing those who have been executed during his time in Death Watch. *Id.* at ¶ 50. His housing in Death Watch, therefore, subjects him to undue suffering well beyond what a neurotypical prisoner would experience. *Id.* at ¶ 32.

The combination of the conditions in Death Watch and Mr. Tabler's serious mental disabilities has compelled him to attempt to kill himself multiple times. *Id.* at ¶¶ 33-55. Mr. Tabler has repeatedly made clear to TDCJ that his mental health is being savaged by his housing in Death Watch and being forced to see over 90 people, including over a dozen friends, taken to be executed, soon after he meets them. *Id.* at ¶¶ 33, 38-41, 43, 45-54. These attempts have continued and include a June 2019 incident in which he sliced his arm open from wrist to shoulder and nearly died. *Id.* at ¶ 56.

In 2011, a federal judge found that Mr. Tabler's conditions in the Death Watch section were so severe that they were coercive as a matter of law—i.e. the conditions had effectively forced him into dropping his habeas appeals in order to be executed sooner. *Id.* at ¶ 24. These

conditions have not changed, and Mr. Tabler remains housed in the Death Watch section in the same torturous conditions that the judge concluded coerced him into seeking a speedy death. *Id.* at ¶¶ 25, 57. Mr. Tabler has never been afforded meaningful process to challenge his housing in the Death Watch section and argue for transfer to TDCJ's less restrictive death row. *Id.* at ¶ 26.

Defendant has no valid penological justification to continue to house Mr. Tabler in Death Watch indefinitely, and his housing there inflicts disproportionate punishment on him. *Id.* at ¶¶ 62-63. Mr. Tabler's housing inflicts serious and irreparable psychological injury and violates present standards of human dignity. *Id.* at ¶¶ 60-61. Defendant's housing of Mr. Tabler indefinitely in Death Watch imposes atypical and significant hardship on him in relation to the ordinary incidents of prison life, and no other prisoner has been held indefinitely in Death Watch as Mr. Tabler has been. *Id.* at ¶¶ 73-74. Therefore, he is entitled to meaningful process to attempt to argue to be moved back to death row, and he has never received this process. *Id.* at ¶¶ 70-72.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal of a complaint for "failure to state a claim upon which relief can be granted." "To defeat a Rule 12(b)(6) motion to dismiss, a plaintiff must 'nudge[ ] their claims across the line from conceivable to plausible' by pleading 'enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. Bradshaw*, No. 9:16-CV-112, 2017 U.S. Dist. LEXIS 156993, at *3 (E.D. Tex. Aug. 10, 2017) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a Rule 12(b)(6) motion, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

"It is axiomatic that a motion to dismiss an action for failure to state a claim upon which relief can be granted admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." *Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir. 1969). Under the

4

appropriate standard, "[a] motion to dismiss on the basis of the pleadings alone should rarely be granted." *Id.* The same standard applies to Defendant's motion to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(1). *See, e.g., Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).

## IV. ARGUMENT

Plaintiff has plausibly alleged violations of his federal constitutional and statutory rights. Defendant's arguments in the present motion are founded on (1) minimizing the psychological torture that Mr. Tabler continues to undergo while housed in Death Watch and (2) implying that Mr. Tabler is asking for something more than transfer to death row and that a ruling in his favor would open the floodgates on litigation from other death row prisoners. This Court must reject Defendant's attempts to rewrite and contradict Mr. Tabler's allegations and must allow his claims to proceed to discovery.

### A. **Plaintiff has plausibly alleged violations of his Eighth and Fourteenth Amendment rights.**

Mr. Tabler has plausibly pled violations of his right to be protected from cruel and unusual punishment in the conditions of his confinement. Defendant's continued housing of him in the Death Watch Unit is catastrophic for his mental health, Defendant has continued to house him there years beyond any penological reason for doing so, and Defendant's conduct for the last decade (as well as Defendant's argument in the present motion) make clear that Defendant has every intention of keeping Mr. Tabler housed there indefinitely.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Gates v. Cook*, 376 F.3d 323, 332-33 (5th Cir. 2004). Courts must analyze prison conditions according to "'the evolving standards of decency that mark the progress of a maturing society' and not the standards in effect during the time of the drafting of the Eighth

Amendment." *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 102 (1976)). As part of the analysis of humane conditions, a prisoner's "mental health needs are no less serious than physical needs." *Gates*, 376 F.3d at 332-33.

A prison official violates the Eighth Amendment when she "1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate." *Gates*, 376 F.3d at 332-33. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

"Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need."  Moreover, the Supreme Court has stressed that "the length of confinement cannot be ignored…. A filthy, overcrowded cell … might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney,* 437 U.S. 678, 686-87 (1978). A plaintiff "need not show that death or serious illness has occurred."  *Helling v. McKinney,* 509 U.S. 25, 32 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

   1.   *Mr. Tabler's conditions of confinement in Death Watch pose a substantial risk of harm to him.*

Mr. Tabler has plausibly alleged that Defendant housing him indefinitely in Death Watch is cruel and unusual punishment that violates his constitutional rights. Plaintiff's conditions of confinement are severely restrictive and cause obvious and well-known destruction to his mental health. *See generally Complaint*, ¶¶ 10-57. What limited human interaction he has had in the last

decade has been almost entirely with men who are on the verge of being killed by the state. After certain of his fellow prisoners have been killed, Mr. Tabler has suffered auditory hallucinations, during which he hears their voices. These conditions have compelled him to attempt to kill himself multiple times during his housing in Death Watch. The conditions also led him to attempt to drop his habeas appeals so as to hasten his death at the hands of the state. Fortunately, a federal judge recognized the severe conditions of Mr. Tabler's confinement and found that the conditions had coerced him to such action. *Id.* at ¶¶ 24, 57.

Mr. Tabler's conditions of confinement are at least comparable to those found to violate the Eighth Amendment in by a court of this circuit in 1999. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F.Supp.2d 975 (S.D.Tex.2001). In *Ruiz*, the court found violations of the constitutional rights of prisoners in TDCJ administrative segregation because the conditions cause them to "suffer actual psychological harm from their almost total depravation of human contact, mental stimulus, personal property and human dignity." *Id.* The court reasoned that it was clear in 1999 "that under American jurisprudence, deprivation of activity, exercise, mental stimulation and activity, at some level, is the denial of a basic human necessity." *Id.* The court quoted liberally and correctly from another federal judge, establishing:

> We thus can not ignore, in judging challenged conditions of confinement, that all humans are composed of more than flesh and bone--even those who, because of unlawful and deviant behavior, must be locked away not only from their fellow citizens, but from other inmates as well. Mental health, just as much as physical health, is a mainstay of life. Indeed, it is beyond any serious dispute that mental health is a need as essential to a meaningful human existence as other basic physical demands our bodies may make for shelter, warmth or sanitation.

*Id.* (quoting *Madrid v. Gomez*, 889 F. Supp. 1146, 1261 (N.D. Cal. 1995).

"As the pain and suffering caused by a cat-o'-nine-tails lashing an inmate's back are cruel and unusual punishment by today's standards of humanity and decency, the pain and suffering

caused by extreme levels of psychological deprivation are equally, if not more, cruel and unusual. The wounds and resulting scars, while less tangible, are no less painful and permanent when they are inflicted on the human psyche." *Ruiz*, 37 F.Supp.2d at 914. Finally, the court noted that segregation and severe solitary confinement may be necessary in some circumstances for legitimate penological interests, but when conditions are so extreme as to violate the United States constitution and "the remedial powers of a federal court are invoked to protect the constitutional rights of inmates, the court may not take a 'hands-off' approach." *Id.* at 914-15.

Other courts in the years since *Ruiz* that have examined similar solitary conditions have made clear that "[t]he same standards that protect against physical torture prohibit mental torture as well - including the mental torture of excessive deprivation." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 677-79 (M.D. La. 2007) (quoting *Ruiz*, 37 F.Supp.2d at 914. Regardless of what earlier cases said on similar subjects, "[t]he standard for determining whether prison conditions satisfy the Eighth's Amendment objective component, whether the condition is 'sufficiently serious,' is not static" and instead "focuses on whether the conditions are contrary to 'the evolving standards of decency that mark the progress of a maturing society.'" *Wilkerson*, 639 F. Supp. 2d at 677-79 (quoting *Farmer*, 511 U.S. at 833-34).

Specifically, the court in *Wilkerson* reasoned that:

> Such things as food, sleep, clothing, shelter, medical attention, reasonable safety, sleep, and exercise have been recognized by courts as basic physical human needs subject to deprivation by conditions of confinement. While the defendants urge the court not to recognize social interaction and environmental stimulation as basic human needs, the failure to identify them would be inconsistent with jurisprudence recognizing mental health as worthy of Eighth Amendment protection, and the requirement that Eighth Amendment protections change to reflect "evolving standards of decency that mark the progress of a maturing society." *Ruiz v. Johnson*, 37 F.Supp.2d 855 (S.D.Tex.1999), citing *Rhodes*, 452 U.S. at 346, 101 S.Ct. 2392. Additionally, recognizing social interaction and environmental stimulation as basic human needs is hardly going out on a radical limb, as defendants would suggest. In *Ruiz*, the district court found that the defendants were "deliberately indifferent to a systemic pattern of

8

> extreme social isolation and reduced environmental stimulation," and social
> interaction and environmental stimulation have been identified as basic
> psychological human needs, either directly or indirectly, by other courts.

*Id.*

Since at least 1999, courts in this circuit have correctly determined that "in light of the maturation of our society's understanding of the very real psychological needs of human beings, courts have recognized the inhumanity of institutionally-imposed psychological pain and suffering" and that such recognition is not defeated by previous cases' focus on "the basic components of physical sustenance - food, shelter, and medical care." *Ruiz*, 37 F. Supp. 2d at 914. Moreover, courts around the country have rightly reasoned that it is not "rocket science" that "prolonged isolation from social and environmental stimulation increases the risk of development of mental illness." *Shoatz v. Wetzel*, 2014 U.S. Dist. LEXIS 9386, 2014 WL 294988, at *4, n.3 (W.D. Pa. Jan. 27, 2014) (quoting *McClary v. Kelly*, 4 F. Supp.2d 195, 209 (W.D.N.Y. 1998)); *see also Grissom v. Roberts*, 902 F.3d 1162, 1176 (10th Cir. 2018) (Lucero, J., concurring) ("[s]ocial interaction, environmental stimulation, and activity are basic human needs" and "[p]sychologically, solitary confinement is devastating."); *H'Shaka v. O'Gorman*, 2020 U.S. Dist. LEXIS 42908, *50-55 (N.D.N.Y. March 12, 2020) (collecting cases as establishing social contact and environmental stimulation as basic human needs for the purposes of the Eighth Amendment analysis).

Moreover, "[b]oth the Supreme Court and the Fifth Circuit have recognized that certain conditions that would pass constitutional scrutiny if imposed for a short period of time may be rendered unconstitutional if imposed for an extended period of time." *Wilkerson*, 639 F. Supp. 2d at 679; *see also Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir. 1986) ("[T]he duration of a prisoner's confinement in administrative segregation or under lockdown restrictions is certainly an important factor in evaluating whether the totality of the conditions of confinement constitute

cruel and unusual punishment."). Mr. Tabler has suffered these conditions for nearly a decade, and there is no end in sight. Defendant obviously intends to keep him housed in Death Watch until he is either executed or succeeds on his still-pending habeas appeals. Whether or not being housed in solitary confinement and restricted to very limited human contact with only other prisoners who are soon to be executed would violate Mr. Tabler's constitutional rights, such housing for ten years and counting, with the expectation that such housing will continue for as long as Mr. Tabler is alive, is cruel and unusual punishment.

> 2.   *Defendant is deliberately indifferent to the substantial risk of harm, and Defendant's Eighth Amendment arguments are erroneous.*

It is also clear (and does not appear to be disputed) that Defendant knows of the substantial harm to Mr. Tabler and yet persists in housing him in Death Watch. Indeed, "the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years" strongly indicates that such risks are obvious. *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019) ("[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause."). Defendant is aware both (1) of Mr. Tabler's mental disabilities and recurring serious mental health crises and (2) that his housing in what amounts to solitary-plus (a place in which all of your peers are killed within months) is calamitous to his mental health.

In response to Plaintiff's allegations of torturous indefinite solitary confinement among those who are soon killed, Defendant Davis now indicates that Mr. Tabler has been housed in the Death Watch Unit for a decade in order to protect him from harming himself. *Def's Mot.* at 17 n.6. However, later in the same motion, Defendant Davis insists that "if TCDJ were to move the Plaintiff into a less restrictive housing area, it would put the rest of the prison and prison

officials, and possibly the public at risk." *Id.* at 20 n.7. All of which is to say, Defendant Davis has no reason why Mr. Tabler must continue to be confined in the Death Watch Section, and Mr. Tabler has plausibly pled that others could be protected from his vague, ominous malice perfectly effectively in the normal Death Row (which is in no way un-restrictive). *See Complaint*, at ¶ 63. Defendant's lack of justification for continuing to house Mr. Tabler in Death Watch indefinitely also makes clear that this is exactly the type of "unnecessary and wanton infliction of pain" that is prohibited by the Eighth Amendment. *See, e.g., Hernandez v. Velasquez*, 522 F.3d 556, 560-61 (5th Cir. 2008); *see also H'Shaka*, 2020 U.S. Dist. LEXIS 42908, *50-55 (collecting cases for the proposition that indefinite confinement in solitary conditions "that is based on past [] conduct, and that fails to take into account a lack of more-recent serious disciplinary infractions over a lengthy period of time, suggests a violation of the Eighth Amendment."). Moreover, the question of whether Defendant has a legitimate justification for Mr. Tabler's indefinite housing in Death Watch is not one for this Court to decide on a motion to dismiss. *See, e.g., Wilkerson*, 639 F. Supp. 2d at 668-69 (accepting plaintiff's argument that defendants had no legitimate penological interest in continuing to keep them in solitary confinement for the purposes of the Eighth Amendment and rejecting defendants' generic assertion that the need for facility safety provided a legitimate penological interest under the circumstances).

Defendant also makes light of both Mr. Tabler's serious mental disabilities and the nightmarish conditions he has lived in for a decade, asserting without basis that allowing this suit to proceed into discovery "would be opening the door for any inmate who wants to get off death row or out of restrictive housing" to sue based on "the possibility they may feel less anxious or depressed or be able to make friends." *Id.* at 20 n.7; *see also id.* at 26 n.8 (finding irony in Mr. Tabler's nightmares). Plaintiff is not asking to be moved out of Death Row, altogether. He is not

asking to be freed. And despite Defendant's baseless hints to the contrary, Mr. Tabler is not a threat to anyone else and certainly not to such a degree that he could not be comfortably managed in standard Death Row. Read correctly, Mr. Tabler's lawsuit does not threaten the parade of horribles that Defendant conjures.

Defendant relies heavily on *Ruiz v. Davis*, 850 F.3d 225, 228 (5th Cir. 2017) as dispensing with Mr. Tabler's § 1983 conditions of confinement claim. *See Def's Mot.* at 8-9. However, *Ruiz* has nothing to do with Mr. Tabler's case. There, a Death Row inmate sued on the eve of his execution, alleging that the significant delay between his conviction and execution the multiple previous stays of execution that he had been granted made the "ultimate punishment [of execution] cruel and unusual." *Ruiz*, 850 F.3d at 228. The Fifth Circuit denied him a certificate of appealability, noting that Ruiz had been granted two previous stays to consider his claims, and that his current argument amounted to an attack on capital punishment itself. *Id.* at 229-30. Importantly, the Fifth Circuit made clear that it did not "address the conditions death row inmates, in Texas or elsewhere, face generally. The solitary confinement of prisoners has long been at issue in suits challenging prison conditions." *Id.* at 229. The Court also noted that, "[d]espite being a named plaintiff in a § 1983 method-of-execution suit challenging Texas's lethal injection protocol filed last year, Ruiz voiced no concern regarding Texas's death row conditions of confinement, this at a time that would have allowed him to develop his claims in the district court. Had he done so, we might be properly situated to determine the merit of such claims." *Id.*

Read properly, *Ruiz* has no relevance to Mr. Tabler's claims; Mr. Ruiz sought relief declaring his imminent execution unconstitutional. He did not challenge the actual conditions of confinement of Texas' death row, let alone the even more restrictive and harsh conditions in Death Watch. Mr. Tabler is clearly not seeking any comparable relief in this case. For similar

12

reasons, Defendant's string cite of purportedly similar cases has no relevance to Mr. Tabler's suit and cannot be grounds to dismiss his § 1983 claim. Mr. Tabler is not suing to be released from Death Row.

In general, the tone of Defendant's arguments regarding conditions of confinement make them seem as though they were written at least twenty years ago. *See Def's Mot.* at 11-12. For example, Defendant states that "to the extent that prison conditions are restrictive and harsh, they are part of the penalty that criminal offenders pay for their offenses to society." *Id.* at 11. Of course, this statement—citing a 1981 Supreme Court opinion as support—begs the question presented by Mr. Tabler's lawsuit. It is not, in fact, true as Defendant's definitive statement would make it seem that there are no conditions so restrictive and/or harsh as to violate the United States Constitution. Indeed, Mr. Tabler has alleged such conditions, and he has done so according to the evolving standards of decency that have progressed well beyond the state of the law in 1981. In recent years, courts around the country have recognized "that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment." *Porter*, 923 F.3d at 355-64 (collecting cases); *Reynolds v. Arnone*, 402 F. Supp. 3, 16-20 (D. Conn. August 27, 2019).

Finally, Defendant completely diminishes, misconstrues, and contradicts Mr. Tabler's allegations by stating that "the Eighth Amendment does not afford protection against discomfort and inconvenience" and that "removal of Tabler from the restrictive housing will do more harm than good to anyone." *Def's Mot.* at 12. Mr. Tabler has not alleged "discomfort and inconvenience;" he *has* alleged that he has been housed in a uniquely torturous environment for ten years and that there is every indication that Defendant intends to house him there for the rest of his life. For the reasons stated above, this Court should deny Defendant's motion to dismiss Plaintiff's claim of unconstitutional cruel and unusual punishment.

B. **Plaintiff has plausibly alleged violations of his constitutional right to Due Process.**

Mr. Tabler's conditions of confinement are some of the most restrictive and atypical that exist in any prison in this country. Indeed, his conditions of confinement are nearly unique among the living. By definition, his conditions are shared only by those who will soon be killed by the state. This existence continues to wreak havoc on his mental health and subject him to hardships that not even those in death row suffer. He has not been provided process to state his case to be moved from this terrible existence back to TDCJ's standard death row.

Defendant Davis now argues that Mr. Tabler has no liberty interest in avoiding these conditions by being housed in death row rather than Death Watch. *Def's Mot.* at 12-14. The Supreme Court has made clear that an inmate *does* have a protected Due Process liberty-interest in the conditions of his housing, if that housing "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005). "[T]he touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Id.*

In *Wilkinson*, the Supreme Court examined Ohio Supermax conditions, including the facts that "almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. In addition to these conditions, the Court noted that such housing was of indefinite duration and was only reviewed annually, and transfer to the facility eliminated an inmate for parole eligibility. *Id.* The Court was "satisfied that assignment to OSP imposes an atypical and significant hardship under any plausible baseline." *Id.* Finally, the Court noted that even if the harsh conditions could be viewed

14

as necessary, "[t]hat necessity . . . does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance." *Id.*

Mr. Tabler's conditions of confinement are similar to *Wilkinson*, as well as the other cases discussed in the previous section. He is subject to severe solitary confinement, with minimal human contact. Importantly, Mr. Tabler has been housed in Death Watch for nearly a decade, and it is clear that Defendant intends his housing there to be indefinite. This factor was fundamental to the Supreme Court's decision in *Wilkinson* and has been central to court's analyses of similar housing ever since. *See, e.g., Wilkerson v. Goodwin*, 774 F.3d 845, 855-56 (5th Cir. 2014); *see also Sandin v. Conner*, 515 U.S. 472, 486 (1995) (holding that there was no liberty interest in part because a 30-day period of disciplinary segregation was not of atypical, excessive duration). And like *Wilkinson*, even if a factfinder were eventually to deem this housing necessary, Mr. Tabler is still entitled to due process to avoid the severely restrictive conditions.

Mr. Tabler's conditions of confinement on Death Watch are also similar to those examined in *Wilkerson v. Goodwin*. 774 F.3d 845, 855-56 (5th Cir. 2014). In that case, the Fifth Circuit confronted prison conditions, including solitary confinement conditions for 23 hours per day, "significant limitations on human contact, and placement is indefinite." *Id.* The Court concluded that the conditions were sufficiently severe, despite the prisoner being allowed "some contact visits, telephone privileges, peer counseling, and correspondence courses." *Id.* Viewing the extended solitary isolation, limited human contact, and many years that the plaintiff had been subject to these conditions "collectively" the Court held that "there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest under *Sandin*." *Id.* The Fifth Circuit held that this conclusion was particularly true because the plaintiff's housing was "effectively indefinite," reasoning that this was a "significant factor" in the Supreme Court's

decision in *Wilkinson*. *Id.* For the same reasons, Mr. Tabler's indefinite confinement in conditions with severely limited human interaction and 22-hour solitary confinement in a tiny cell pose "atypical and significant hardships" such that he has a liberty interest and a concomitant Due Process right to be afforded an opportunity to avoid such confinement and be moved to death row.

Defendant argues that Mr. Tabler has not pointed to a state policy that creates such a liberty interest. *See Def's Mot.* at 8. However, that line of reasoning has been outmoded for at least 15 years. In *Wilkinson*, the Supreme Court noted its previous, sometime, focus on what policies a state did or did not have regarding housing and transfer. *Wilkinson*, 545 U.S. at 222-23. The Court reasoned that such a focus "creat[ed] a disincentive for States to promulgate procedures for prison management." *Id.* Therefore, the Court adopted the "atypical and significant hardship" standard and explicitly rejected myopic examination of prison policies. *See id.* ("the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions.").

Defendant also cites to an unpublished Fifth Circuit case, dismissing a *pro se* prisoner's appeal as frivolous to contend that "[p]risoners have no constitutionally protected liberty interest in a particular housing assignment." *Def's Mot.* at 12 (citing *Nathan v. Hancock*, 477 F. App'x 197, 199 (5th Cir. 2012)). However, as in the previous section, this statement begs the question and is simply not true as a matter of law. As explained above, a prisoner does have a "constitutionally protected liberty interest in a particular housing assignment," when he can establish that his housing "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 222-23.

What each of the cases Defendant cites lacks is an indefinite duration of the severe conditions present here. Mr. Tabler has been housed in these torturous conditions for nearly a decade. And it is clear that Defendant intends to keep him in these conditions indefinitely. In examining similar conditions of solitary confinement and/or segregation, the Fifth Circuit has indicated that "two and a half years of segregation is a threshold of sorts for atypicality." *Bailey v. Fisher*, 647 F. App'x 472, 476-77 (5th Cir. 2016). The Fifth Circuit has also noted that eight years or more of such solitary confinement has been found sufficient to establish a liberty interest, especially where there is no prospect of transfer to less restrictive housing. *See Wilkerson*, 774 F.3d at 855-56.

Finally, Defendant's argument that Mr. Tabler's current and continued housing in Death Watch in 2020 is justified by the misdeeds that got him placed there in the first place (over a decade ago) makes clear that Defendant will never move Mr. Tabler. *See Def's Mot.* at 12-14. This exact argument has previously been viewed as establishing an indefinite housing decision, with substantial importance to the Due Process analysis. *See, e.g., Wilkerson*, 774 F.3d at 855-56 (holding that a review board's repeated insistence on continued confinement based on the original infraction made clear that the reason for such housing could never change and was in fact indefinite). For the same reasons, Mr. Tabler's indefinite housing in Death Watch poses atypical and significant hardships; he is, therefore owed due process to challenge his continued housing in Death Watch, rather than in death row with all other prisoners who, like him, have been sentenced to death but do not yet have an execution date.

**C.** **Defendant is not entitled to sovereign immunity.**

Defendant Davis is not entitled to sovereign immunity on Plaintiff's claims seeking injunctive relief for continuing violations of his federal constitutional and statutory rights. "Sovereign immunity is not limitless, and this case involves an important caveat—the *Ex parte*

*Young* exception." *Williams v. Reeves*, 954 F.3d 729, 735-36 (5th Cir. 2020). *Ex Parte Young* allows a plaintiff to sue a state official in her official capacity, as long as the plaintiff "seeks prospective relief to redress an ongoing violation of federal law." *Id.* "Though an *Ex parte Young* suit has an 'obvious impact on the State itself,' it is an essential mechanism for affirming the supremacy of federal law." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-05 (1984)).

The Fifth Circuit has noted three requirements for an *Ex Parte Young* suit—it "must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law." *Williams*, 954 F.3d at 735-36. As a fundamental matter, the state official who is named as defendant must have a "sufficient connection [to] the enforcement" of the unconstitutional acts. *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019).

Defendant does not appear to dispute that she has a "sufficient connection" to the federal constitutional and statutory violations Mr. Tabler has alleged; she clearly has the power to order Mr. Tabler moved. *See generally Def's Mot.* at 4-6. Instead, Defendant's argument that *Ex Parte Young* does not allow Mr. Tabler's suit is based on the conclusory assertion that he "does not allege a continuing violation of federal law." *Def's Mot.* at 6. The above facts and legal discussion should make abundantly clear that Mr. Tabler is absolutely alleging a continuing violation of federal law. And fundamentally, "the inquiry into whether suit lies under *Ex Parte Young* does not include an analysis of the merits of the claim." *Williams*, 954 F.3d at 735-36. If a complaint alleges an ongoing violation of federal law (as Mr. Tabler's does) and seeks relief properly characterized as prospective (as Mr. Tabler's also does), the suit complies with the requirements of *Ex Parte Young*. *See id.*

### D. **Plaintiff has plausibly alleged violations of his rights under the ADA.**

Mr. Tabler has plausibly alleged violations of his rights under the Americans with

Disabilities Act ("ADA"). Defendant again asserts that she is entitled to sovereign immunity.

However, with respect to an ADA claim, the issue of sovereign immunity is bound up with the

merits. *See, e.g., Hale v. King*, 642 F.3d 492, 497-98 (5th Cir. 2011). In such a case, a court

considers "which aspects of the State's alleged conduct violated Title II [of the ADA]" and then

determines whether the State's conduct "also violated the Fourteenth Amendment." *Id.* at 498.

"If the State's conduct violated both Title II and the Fourteenth Amendment, Title II validly

abrogates state sovereign immunity." *Id.*

"A plaintiff states a claim for relief under Title II if he alleges: (1) that he has a qualifying

disability; (2) that he is being denied the benefits of services, programs, or activities for which

the public entity is responsible, or is otherwise discriminated against by the public entity; and (3)

that such discrimination is by reason of his disability." *Id.* at 499.

Mr. Tabler has plausibly alleged that he is an individual with a qualifying disability.

Courts throughout this circuit have recognized that serious mental illness can constitute a

qualifying disability for purposes of an ADA discrimination claim. For example, in *Williamson*

*v. Larpenter*, the court determined that plaintiff had plausibly alleged a qualifying disability

based on his mental illness, "including depression, suicidal tendencies, [and] mood and behavior

alterations." No. 19-254, 2019 U.S. Dist. LEXIS 133628, at *35-36 (E.D. La. July 15, 2019). In

reaching this conclusion, the court noted that "[d]epression and other mental illnesses can qualify

as disabilities for purposes of the ADA." *Id.* (quoting *Stradley v. Lafourche Commc'ns, Inc.*, 869

F. Supp. 442, 443 (E.D. La. 1994)). The court also found that plaintiff's "history of depression

and multiple suicide attempts indicate that his mental impairments limited his ability to engage in

the most basic life activity there is — keeping himself alive." *Williamson*, 2019 U.S. Dist.

19

LEXIS 133628, at *35-36. Based on these allegations, the court determined that plaintiff's "impairments of depression and mental illness constitute a qualifying disability under the ADA." *Id.*

Similarly, in *Carter v. Cain*, the court considered claims that the prisoner-plaintiff was disabled due to his "mental illness, psychosis, paranoia, acute anxiety, [and] hallucinations," and that he "was at high risk of suicide." No. 17-201-SDD-RLB, 2019 U.S. Dist. LEXIS 27293, at *33-35 (M.D. La. Feb. 21, 2019). The court reasoned that such disabilities could substantially limit plaintiff's ability to engage in "major life activities," like "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* The court specifically determined that "Plaintiff's allegations describe how Terrance Carter's mental illness caused him debilitating anxiety and even interfered with his ability to perceive reality," and that based on these allegations "a reasonable factfinder could conclude that Carter had a 'qualified disability' under the ADA." *Id.*

Lastly, a court of this circuit has determined that a plaintiff-prisoner plausibly alleged an ADA claim based on her housing in solitary confinement, despite her known mental illness. *See Wade v. Montgomery Cty.*, No. 4:17-CV-1040, 2017 U.S. Dist. LEXIS 216522, at *15-17 (S.D. Tex. Dec. 6, 2017). In that case, plaintiff alleged that her placement in solitary confinement constituted disability discrimination because it exacerbated her mental illness. *Id.* The court concluded that

> This allegation also plausibly states a claim upon which Plaintiff could recover. *See Wright v. Texas Dept. of Criminal Justice*, Cause No. 7:13-CV-0116-O, 2013 U.S. Dist. LEXIS 176222, 2013 WL 6578994 (N.D. Tex. Dec. 16, 2013) (holding that jail failed to reasonably accommodate inmate's mental disability when it placed him in a solitary cell where he was able to attempt suicide, and that was sufficient to show a prima facie violation of the ADA and Rehabilitation Act); *Lee v. Valdez*, Cause No. No. 3:07-CV-1298-D, 2009 U.S. Dist. LEXIS 43381, 2009 WL 1406244 (N.D. Tex. May 20, 2009) (noting that a jail's refusal to accommodate an inmate's mental health needs constitutes an impermissible

denial of benefits or services); *McCoy v. Tex. Dep't Crim. Justice*, Cause No. C-05-370, 2006 U.S. Dist. LEXIS 55403, 2006 WL 2331055, at *7, n.6 (S.D. Tex. Aug. 9, 2006) ("In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.").

*Id.* The court then reasoned that "[b]ecause these allegations 'are to be taken as true,' they suffice to establish both the second and third elements of a Title II claim," and determined that "[a] fact finder could plausibly conclude from these allegations that Defendant discriminated against Wade by denying her benefits and services due to her alleged disability, and by not accommodating that alleged disability." *Id.* The court reached this conclusion, despite plaintiff not ruling out "benign explanations for her treatment," while stressing that "at this stage of the proceeding, [plaintiff] need not prove her claims, nor must she negate all potential defenses that the County may have. Wade need only allege facts that make her claim plausible." *Id.* (citing *McCoy v. Texas Dep't Crim. Justice*, 2006 U.S. Dist. LEXIS 55403 (S.D. Tex. Aug. 9, 2006) for the proposition that the reasonableness of the requested accommodations was a question for the jury to decide).

As a fundamental matter, pursuant to its statutory authority to issue regulations to carry out the ADA, 42 U.S.C. § 12116 (1994), the Equal Employment Opportunity Commission has refined the definition of "disability" to include "any mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2) (1996). The EEOC has expressly characterized major depression, anxiety disorders, bipolar disorder, and personality disorders as disabilities under the ADA. *See* EEOC Enforcement Guidance: Psychiatric Disabilities and the

Americans With Disabilities Act, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 15 P 1 (Mar. 25, 1997).[1]

With respect to exclusion from "services, programs, or activities," courts have been careful to stress that the "only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or *custodial* capacity are performing 'services, programs, or activities' within the scope of Title II." *Williams v. City of N.Y.*, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015) (emphasis added). As such, "the phrase services, programs, or activities has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'" *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (quoting *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997)); *see also Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012) (reaching the same conclusion while noting that the Department of Justice's regulations confirm that Title II is meant to apply to anything a public entity does). Safe housing in conditions of confinement that are not ruinous to the mental health of mentally disabled prisoners would seem to be among the most fundamental "services" that a prison provides to prisoners.

This view also comports with a broad reading of the ADA consistent with its status as a comprehensive remedial statute, which courts around the country have insisted upon when interpreting the scope and application of the ADA. *See, e.g., Hason v. Medical Bd.*, 279 F.3d 1167, 1172 (9th Cir. 2002) (holding that a narrow construction of the phrase "services, programs,

---

[1] Moreover, courts have accepted that fetal alcohol syndrome (one of the many mental disabilities that Mr. Tabler suffers) can be a qualifying disability under the ADA. *See, e.g., Sims v. Najera*, No. 1:12-cv-00466- AWI- JLT, 2012 U.S. Dist. LEXIS 123098, at *5-7 (E.D. Cal. Aug. 28, 2012) ("[h]ere, Plaintiff's allegation that he suffered from Fetal Alcohol Syndrome is sufficient to demonstrate that he is an individual with a disability."); *see also Lester v. M&M Knopf Auto Parts*, No. 04-CV-850S, 2006 U.S. Dist. LEXIS 70371, at *32-34 (W.D.N.Y. Sep. 28, 2006).

or activities" ran contrary to "the remedial goals underlying the ADA."); *see also Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 160 (2d Cir. 2013); *Steger v. Franco, Inc.*, 228 F.3d 889, 894 (8th Cir. 2000); *Arnold v. UPS*, 136 F.3d 854, 861 (1st Cir. 1998).

Lastly, the question of whether Defendants refused to provide Mr. Tabler a reasonable accommodation is a question of fact that is to be decided by the factfinder. *See, e.g., EEOC v. Universal Mfg. Corp.*, 914 F.2d 71 (5th Cir. 1990). Mr. Tabler has plausibly alleged a reasonable accommodation that Defendant has refused—transfer out of Death Watch and back to death row. *See Complaint*, ¶ 86. "[T]he Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA and the RA." *Hacker v. Cain*, No. 3:14-00063-JWD-EWD, 2016 U.S. Dist. LEXIS 73014, at *40 (M.D. La. June 6, 2016) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004) and *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)). That said, as in all such disability discrimination cases, this question is "highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns." *Bahl v. Cty. Of Ramsey*, 695 F.3d 778, 784-85 (8th Cir. 2012) (citing *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1086 (11th Cir. 2007)).

Because Mr. Tabler has plausibly alleged Defendant's violation of his rights under Title II of the ADA, this Court must consider whether Defendant's conduct violates the Fourteenth Amendment. *See United States v. Georgia*, 546 U.S. 151, 159 (2006). If Defendant's misconduct also violates the Fourteenth Amendment, then Defendant is not entitled to sovereign immunity because Title II has validly abrogated such immunity under the facts of this case. *Id.* As explained above, Defendant's conduct has violated and continues to violate multiple protections afforded to Mr. Tabler by the Fourteenth Amendment. Moreover, "Congress' power 'to enforce'

the [Fourteenth] Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Arce v. Louisiana*, 306 F. Supp. 3d 897, 909 n.36 (E.D. La. 2017) (quoting *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001)). "In other words, Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727-28, 123 S. Ct. 1972, 155 L. Ed. 2d 953 (2003). Plaintiff has plausibly alleged that Defendant's conduct violates both the ADA and the Fourteenth Amendment; therefore, Defendant is not entitled to sovereign immunity, and Plaintiff's ADA claim should not be dismissed.

In the alternative, if this Court were to conclude that Plaintiff has not plausibly alleged a violation of his rights under the ADA, he should be allowed a chance to amend his complaint to remedy any deficiencies. In a similar disability discrimination case, a district court in this circuit explained the necessity of amendment and allowed plaintiff to amend to cure deficiencies in her pleading. *See Wade*, 2017 U.S. Dist. LEXIS 216522, at *24-26. In *Wade*, the court explained:

> The court should freely give leave [to amend the pleadings] when justice so requires. FED. R. CIV. P. 15(a)(2). A decision on whether to permit amendment "is entrusted to the sound discretion of the district court." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993). Nevertheless, the Fifth Circuit has commented that the term "discretion" "may be misleading because FED. R. CIV. P. 15(a) evinces a bias in favor of granting leave to amend." *Mayeaux v. Louisiana Health Serv. & Indemn. Co.*, 376 F.3d 420, 425 (5th Cir. 2004)(citation omitted). "[A]bsent a 'substantial reason' such as undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or undue prejudice to the opposing party, 'the discretion of the district court is not broad enough to permit denial.'" *Id.* (citation omitted).
>
> If a plaintiff's complaint fails to state a claim, the court should generally give her at least one chance to amend it under Rule 15(a), before dismissing the action with prejudice. *Great Plains Trust Co v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is

clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004)("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.").

*Wade*, 2017 U.S. Dist. LEXIS 216522, at \*24-26; *see also Hale*, 642 F.3d at 503 (remanding to allow plaintiff "opportunity to amend his Title II claim after being alerted to its deficiencies.").

For the reasons stated above, Plaintiff's ADA disability discrimination claim should be allowed to proceed, or he should be allowed to amend after being alerted to any deficiencies.

**E.  Plaintiff's claims are not barred by any statute of limitations.**

Finally, Mr. Tabler's claims are not barred by any statute of limitations. Defendant asserts that Mr. Tabler's claims are barred by that statute of limitations for § 1983 claims. *See Def's Mot.* at 26-28. "This argument mischaracterizes the nature of harm that Plaintiff allegedly suffered. Plaintiff has pled a continuing injury. In a continuing injury case, the wrongful conduct continues to create an additional injury to the Plaintiff until the conduct stops." *Foddrill v. McManus*, Civil Action No. SA-13-CV-00051-XR, 2013 U.S. Dist. LEXIS 125837, at \*7-9 (W.D. Tex. Sep. 4, 2013). As the Fifth Circuit has made clear, "[w]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974). "In Texas, a continuing tort occurs where 'the wrongful conduct continues to effect additional injury to the plaintiff until that conduct stops.'" *Whitaker v. Collier*, 862 F.3d 490, 496 (5th Cir. 2017).

Mr. Tabler is not challenging his initial placement in the Death Watch section. He is also not challenging any other discrete-in-time decision by Defendant, especially considering he has not been provided process due to him to challenge his indefinite housing. Instead, he is challenging his continued housing in the Death Watch section, without due process and without reasonable accommodation to his known and obvious mental disabilities. As the various above

25

discussions should make clear, he has plausibly alleged that every day he is kept in the Death Watch section is a new, compounding injury. His suit is similar to other challenges to indefinite solitary confinement that have involved long periods of time between the beginning of such restrictive confinement and the filing of suit. *See, e.g., Wilkerson*, 774 F.3d at 855-56 (addressing decades-long solitary confinement and collecting cases of similar years-long, indefinite confinements). The injuries that Mr. Tabler has suffered and continues to suffer can only be remedied by Defendant Davis ordering that he be moved out of Death Watch and back to death row. Therefore, Mr. Tabler's claims seeking only that prospective relief are not barred by the statute of limitations.

## V.  CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the court deny Defendant's motion to dismiss and allow his claims to proceed to discovery.

Respectfully submitted this 24th day of June 2020.

KILLMER, LANE & NEWMAN, LLP

/s/ David A. Lane
David A. Lane
Reid Allison
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000, Fax: (303) 571-1001
dlane@kln-law.com
rallison@kln-law.com

Richard Burr
Burr and Welch, PC
PO Box 525
Leggett, Texas 77350
(713) 628-3391
(713) 893-2500 fax
dick.burrandwelch@gmail.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I certify that on this 24th day of June 2020, I filed the foregoing via CM/ECF which will generate a notice and service to all counsel of record.

/s/ David A. Lane
David A. Lane
KILLMER LANE & NEWMAN, LLP